**Robert L. TUCKER, et al.,
Plaintiffs–Appellants,**

v.

**UNITED STATES DEPARTMENT OF COMMERCE; Robert A. Mosbacher, as Secretary of Commerce; Michael R. Darby, as Under Secretary for Economic Affairs; Bureau of the Census; Barbara E. Bryant, as Director of the Bureau; George H.W. Bush, as President of the United States; and Donald K. Anderson, as Clerk of the United States House of Representatives, Defendants–Appellees.**

No. 91–2051.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 8, 1992.

Decided March 16, 1992.

Rehearing and Rehearing En Banc
Denied April 29, 1992.

William J. Harte (argued), Joseph E. Tighe, Chicago, Ill., for plaintiffs-appellants.

Fred Foreman, U.S. Atty., Crim. Div., Nancy K. Needles, Asst. U.S. Atty., Civ. Div., Appellate Section, Chicago, Ill., Michael J. Singer, Mark Stern (argued), Dept. of Justice, Civ. Div., Appellate Section, Jason R. Baron, Dept. of Justice, Antitrust Div., Appellate Section, Stephen E. Hart, Anthony J. Coppolino, Dept. of Justice, Federal Programs Branch–Civ. Div., Washington, D.C., for defendants-appellees.

Kelly R. Welsh, Asst. Corp. Counsel, Office of the Corp. Counsel, Appeals Div., Chicago, Ill., for City of Chicago amicus curiae.

Before CUMMINGS, POSNER, and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.

This is a suit by residents of Illinois against the federal executive-branch officials responsible for the decennial census, and also against the Clerk of the House of Representatives. The complaint charges that the 1990 census, by undercounting blacks, Hispanics, illegal aliens, and poor people generally, has violated countless constitutional and statutory provisions, including the constitutional clause governing the apportionment of congressional representation and federal taxes (Art. I, § 2, cl. 3), the statutes that implement that clause (2 U.S.C. § 2a(a) and 13 U.S.C. § 141), the Fourteenth Amendment, the Voting Rights Act (42 U.S.C. § 1973 *et seq.*), and the Administrative Procedure Act (5 U.S.C. §§ 551 *et seq.*). The plaintiffs claim that these violations have caused them to lose representation in the House of Representatives and a fair share of federal and state funds allocated on the basis of the census figures. They seek an injunction to compel the responsible officials to make an appropriate statistical adjustment for the undercount. The district court, 135 F.R.D. 175 (N.D.Ill.1991), dismissed the suit on the pleadings as barred by the "political questions" doctrine. *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973).

The decennial census is a headcount rather than an estimation based on sampling. Nowadays it is conducted mainly by mail, but many people fail to return the form and the census takers must visit them personally. *Carey v. Klutznick*, 508 F.Supp. 420, 422–29 (S.D.N.Y.), aff'd, 637 F.2d 834 (2d Cir.1980); Dan Halacy, *Census: 190 Years of Counting America* 157–77 (1980). The census takers try to account for everybody in America but of course they don't succeed, and they have particular difficulty finding people who lack a fixed abode or mailing address or who want to avoid contact with any representatives of government; in addition, they are doubtless less than completely thorough in canvassing residences in dangerous neighborhoods. If the resulting undercount were randomly distributed across communities, there would be no effect on representation and little effect on the allocation of government largesse. (Little rather than zero because eligibility for some programs depends on a community's population, and even an unbiased undercount might drive the population figure below the threshold. *City of Camden v. Plotkin*, 466 F.Supp. 44, 48 (D.N.J. 1978); Arthur J. Maurice & Richard P. Nathan, "The Census Undercount: Effects on Federal Aid to Cities," 17 *Urban Affairs Q.* 251, 265 (1982).) There is reason to believe, however, that the undercount is not randomly distributed, but instead is concentrated in the poor, among whom blacks and Hispanics are disproportionately represented, and among illegal aliens, who are disproportionately Hispanic. *Carey v. Klutznick, supra,* 508 F.Supp. at 426; *Young v. Klutznick*, 497 F.Supp. 1318,

1327–28 (E.D.Mich.1980), rev'd, 652 F.2d 617 (6th Cir.1981); Kirsten K. West & David J. Fein, "Census Undercount: An Historical and Contemporary Sociological Issue," 60 *Sociological Inquiry* 127, 129 (1990); Note, "Demography and Distrust: Constitutional Issues of the Federal Census," 94 *Harv.L.Rev.* 841, 849–52 (1981); Staff of the Subcomm. on Census and Population of the H. Comm. on Post Office and Civil Service, 96th Cong., 2d Sess., *Report on the 1980 Decennial Census* 56 (1980); U.S. Comm'n on Civil Rights, *Counting the Forgotten: The 1970 Census Count of Persons of Spanish–Speaking Background in the United States* (G.P.O.1974).

The Census Bureau acknowledges all this—specifically, acknowledges an undercount in the 1990 census ranging from 1.7 percent of whites to 5.2 percent of Hispanics, *Adjustment of the 1990 Census for Overcounts and Undercounts of Population and Housing: Notice of Final Decision*, 56 Fed.Reg. 33582 (July 22, 1991), and in response to parallel litigation in the Second Circuit agreed to conduct a comprehensive review of the undercount problem. *City of New York v. United States Dept. of Commerce*, 739 F.Supp. 761, 763–64, 769 n. 9 (E.D.N.Y.1990). It conducted the review with the aid of a panel of outside statistical experts, but concluded (in 60 pages of fine print in the *Federal Register*) that the census figures should not be adjusted to correct for the undercount. *Adjustment of the 1990 Census for Overcounts and Undercounts of Population and Housing: Notice of Final Decision, supra*. The Bureau explained that while adjustment by the best method available would increase the census totals, it would not significantly alter the apportionment of seats in the House of Representatives among the states, in part because there is overcounting as well as undercounting. After the dust settled, Illinois's representation would be unchanged, although California and Arizona would pick up a few seats at the expense of Pennsylvania and Wisconsin. Federal grant allocations might not be much affected either. Maurice & Nathan, *supra*. Moreover, any attempt to make a statistical adjustment to the mechanical headcount would, by injecting judgmental factors—and ones of considerable technical complexity to boot, Allen L. Schirm & Samuel H. Preston, "Census Undercount Adjustment and the Quality of Geographic Population Distributions," 82 *J.Am.Stat. Ass'n* 965 (1987)—open the census process to charges of political manipulation. And while a statistical adjustment for the undercount would undoubtedly improve the accuracy of the nationwide census total, there is no consensus among statisticians and demographers that it would make the state and district census totals—the level at which the adjustment would actually affect representation and funding—more accurate. This lack of consensus feeds the concern with a possible loss of public credibility as a consequence of departing from the (perhaps delusive) simplicity of counting heads.

The plaintiffs disagree with all this and, for all we know, they may be right, but we agree with the district judge that the federal courts have not been authorized to arbitrate the dispute. It should go without saying that federal judges cannot provide a solvent for every social problem or a remedy for every questionable act of government. We cannot provide a remedy for a census undercount, at least where the undercount is not the result of an effort to reduce some group's representation or funding but is merely an accident of the census-taking process.

■ To see this we must be clear about what the plaintiffs do and do not claim. They argue that the undercount harms groups that the equal protection clause of the Fourteenth Amendment protects against discrimination by the states, such as blacks and Hispanics, and they point out correctly that the due process clause of the Fifth Amendment, interpreted in light of the subsequently enacted equal protection clause of the Fourteenth Amendment, forbids such discrimination by the federal government. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). But the only discrimination forbidden by these provisions is *intentional* discrimination. Disparate impact, which means the unin-

tended consequence of measures adopted for reasons unrelated to any intention to discriminate, is not, under the Supreme Court's current interpretation of the Constitution, an acceptable basis for a finding of *unconstitutional* discrimination, whatever the significance of such a showing may be under the civil rights statutes. *Washington v. Davis*, 426 U.S. 229, 239–45, 96 S.Ct. 2040, 2047–50, 48 L.Ed.2d 597 (1976); *City of Mobile v. Bolden*, 446 U.S. 55, 66–68, 100 S.Ct. 1490, 1499–500, 64 L.Ed.2d 47 (1980). The plaintiffs do not argue that by refusing to adjust the census count the defendants are guilty of intentional discrimination—are prejudiced against blacks, or Hispanics, or aliens (or for that matter the poor, although they are not a protected class under the Constitution as it is at present interpreted, *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)), or want to deprive members of these groups of equal representation or equal public funding, or even that the defendants want to undercount these people. The plaintiffs accept the bona fides of the Census Bureau and the inevitability of an undercount and merely disagree with the Bureau's judgment that making a statistical adjustment to the raw headcount would create problems disproportionate to the benefits.

■ The plaintiffs cannot be serious in arguing that the refusal to adjust the headcount violates the Voting Rights Act. That Act provides remedies only against "any State or political subdivision" of a state. 42 U.S.C. § 1973; and see §§ 1973a to 1973dd–5. The Fourteenth Amendment is likewise limited to state action. The plaintiffs' invocation of these enactments is a throwaway. They do seem to be serious, however, in arguing that Congress has violated Article I, section 2, clause 3 of the Constitution, which provides that representatives "shall be apportioned among the several States ... according to their respective Numbers," by basing the apportionment on census figures uncorrected for the undercount. It is this argument, presumably, that explains why the complaint names the Clerk of the House of Representatives as a defendant. *Montana v. United States Dept. of Commerce*, 775 F.Supp. 1358 (D.Mont.1991) (3–judge court), prob. juris. noted, —— U.S. ——, 112 S.Ct. 656, 116 L.Ed.2d 747 (1991), holds on grounds unrelated to the accuracy of the 1990 census that the method used by Congress to apportion congressional seats violates the apportionment clause.

■ The plaintiffs' argument is an extension of the congressional reapportionment cases, notably *Wesberry v. Sanders*, 376 U.S. 1, 7–8, 84 S.Ct. 526, 529–30, 11 L.Ed.2d 481 (1964), which found "one man, one vote" implicit in the apportionment clause plus another provision of Article I, section 2—that representatives shall be chosen "by the People" (cl. 1). The Fifth Amendment, too, might be thought, by analogy to the decisions invalidating the malapportionment of state legislatures under the equal protection clause, to require the federal government to apportion congressional seats among the states in accordance with an accurate estimate of the number of people in each state. *Gray v. Sanders*, 372 U.S. 368, 379, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963); *Reynolds v. Sims*, 377 U.S. 533, 577, 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506 (1964). For those cases do not place on plaintiffs any burden of proving that a malapportionment represents a deliberate effort to dilute some group's voting power. It is enough that the state's electoral districts *are* malapportioned. We assume that those cases survive the later ones, such as *Washington v. Davis, supra,* that require proof of intentional discrimination. The purpose of *that* requirement is to prevent the concept of equal protection from being used to invalidate governmental policies that just happen to bear more heavily against a vulnerable group, whereas the reapportionment cases vindicate a right that the Supreme Court has found to be implicit in the Constitution to an apportionment mechanism that will, so far as possible, give each person's vote the same weight in an election. A state's failure to create the required mechanism is an intentional denial of the right to an equally weighted vote. And while the poor

are not a protected class in the sense that the Fourteenth Amendment entitles them to complain about policies that fail to alleviate their plight, government cannot use wealth to discourage voting, as through a poll tax or property qualifications. *Harper v. Virginia Board of Elections,* 383 U.S. 663, 668, 86 S.Ct. 1079, 1082, 16 L.Ed.2d 169 (1966); *Cipriano v. Houma,* 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (per curiam). By doing so it does not discriminate necessarily but it does place a burden on a right—the right to vote, and derivatively the right to an *equal* vote— that the Supreme Court has found in various provisions of the Constitution.

The plaintiffs' main argument, however, is different from any we have mentioned. It is derived from a constitutional right neither to equal voting power nor to freedom from governmental discrimination, but to census accuracy. The argument is that the Census Bureau (not Congress or the President) has violated the apportionment clause of the Constitution, the census statutes, and the Administrative Procedure Act, all of which (in the plaintiffs' view) implicitly command the Bureau to make whatever adjustments in the raw census totals are necessary to make the census the best feasible estimate, albeit not an actual count (because a perfectly accurate count of upwards of 250 million people isn't feasible), of the American population.

We have our doubts whether, as the district judge believed, the political questions doctrine is a bar to such a suit. The scope, rationale, provenance, and legitimacy of the doctrine remain profoundly unclear. Paul M. Bator *et al., Hart and Wechsler's The Federal Courts and the Federal System* 288–94 (3d ed. 1988); David P. Currie, *Federal Jurisdiction in a Nutshell* 26–30 (3d ed. 1990); 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3524.1, at p. 492 (1984). Perhaps after such cases as *Baker v. Carr* and *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), all that is left is the unexceptionable proposition—undeserving of the dignity of a special doctrine—that the federal judiciary is not permitted to adjudicate ques-

tions that the Constitution has placed within the exclusive jurisdiction of another branch of government, or to disregard traditional limitations on equitable relief. See Herbert Wechsler, *Principles, Politics and Fundamental Law* 11–14 (1961); Louis Henkin, "Is There a Political Question Doctrine?" 85 *Yale L.J.* 597 (1976). The accuracy of the decennial census is not, in any sense apparent to us, one of those questions; nor are the plaintiffs asking for a form of relief that would exceed the bounds of traditional equity power. And whatever the current scope of the political questions doctrine may be, we would have difficulty squaring the application of the doctrine to this case with its rejection in the apportionment cases. Not that this is an apportionment case, or governed by those cases; it is not, as we shall see; but the political sensitivities that might have been thought to bring the apportionment cases within the scope of the political questions doctrine, but did not, are no greater here.

■ Nor do the plaintiffs lack standing, in the Article III sense, to maintain this suit. All they need show in order to demonstrate an Article III case or controversy is, as we have emphasized recently, some probability of a tangible benefit from winning the suit. *Wooten v. Loshbough,* 951 F.2d 768, 769 (7th Cir.1991); *Morales v. Yeutter,* 952 F.2d 954, 956 (7th Cir.1991); *Harris v. Board of Governors,* 938 F.2d 720, 723 (7th Cir.1991); *North Shore Gas Co. v. EPA,* 930 F.2d 1239, 1242 (7th Cir. 1991). There is that here. Even if the adjustment that the Census Bureau considers best would not benefit residents of Illinois because it would not increase the state's seats in the House of Representatives, another adjustment, which a court at the urging of these plaintiffs might think better, might do that. And there is no doubt that, as a matter of fact, the allocation of state and federal funds is heavily influenced by census figures, and for all we know an adjustment in those figures might benefit residents of Illinois disproportionately. Or might not—but the litigation hasn't been allowed to proceed to the point where the plaintiffs would be required to

specify the adjustment they seek, and until then it cannot be determined that they have nothing to gain from winning the case. In *Federation for American Immigration Reform v. Klutznick*, 486 F.Supp. 564 (D.D.C.1980) (three-judge court), in contrast, where standing was denied, the plaintiffs *had* specified the adjustment they wanted—exclusion of illegal aliens—yet had failed to show that they would derive any benefit from the adjustment. And in *Young v. Klutznick*, 652 F.2d 617, 624–25 (6th Cir.1981), another case that rejected on grounds of standing a challenge to the census count, the injury that the plaintiffs claimed to have suffered involved congressional redistricting within a state rather than the allocation of representation across states, and the court pointed out that state legislatures are not required even to use census data in redistricting.

Were courts to insist, as a condition of standing, on proof that a census recount really would help a plaintiff, even a challenge to a malapportioned legislature might fail on grounds of standing, since the actual consequences of reapportionment for the welfare of particular classes of voter or of resident remain, after many years of study, obscure. Timothy G. O'Rourke, *The Impact of Reapportionment* 159 (1980); Larry M. Schwab, *The Impact of Congressional Reapportionment and Redistricting* 196–200 (1988). Maybe the present suit is merely political grandstanding, but there are tangible stakes in *some* census disputes, even though it is many years since officials of St. Paul, Minnesota kidnapped census takers working in Minneapolis and charged them with overcounting. Maurice & Nathan, *supra*, at 251. It is too early to conclude that there are no tangible stakes in this case.

But there are other senses of standing besides the Article III sense. One requires a plaintiff to be an *intended* as distinct from an accidental plaintiff. Not everyone hurt by a violation of a constitutional or statutory provision can sue to redress the violation. What we may call the "intended plaintiff" doctrine has two elements, each of which an aspiring plaintiff must satisfy. One, which in this case is critical, is that he

must show that he is within the class of persons who have been given a right to *litigate* the violation. *Block v. Community Nutrition Institute*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984); *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399–400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987); cf. *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980). This branch of the intended plaintiff doctrine is what prevents a farmer from suing the Weather Bureau for failing to have the best forecasting equipment and methodology, even if he can show that he is injured by the failure and even though the failure if sufficiently egregious could be thought an arbitrary and capricious agency action violative of the Administrative Procedure Act, 5 U.S.C. § 551. No court would permit such a suit to go forward. It would say that the Administrative Procedure Act did not contemplate judicial review of *that* sort of agency action and therefore that the plaintiff had not been "aggrieved" by it within the meaning of 5 U.S.C. § 702.

We must distinguish the problem of standing presented by our hypothetical Weather Bureau case from the more familiar problem, involving the other part of the intended-plaintiff doctrine, that is presented when a plaintiff, however suitable to be a litigation standard bearer he might otherwise be, is not within the class of persons that Congress *intended to be benefited by* the statute under which he sues. *North Shore Gas Co. v. EPA, supra*, 930 F.2d at 1243–44, and other cases cited there; Stephen G. Breyer & Richard B. Stewart, *Administrative Law and Regulatory Policy: Problems, Text, and Cases* 1120 (2d ed. 1985). The reason for denying standing in our hypothetical case would not be that the activities of the Weather Bureau are not intended for the benefit of our hypothetical farmer—they are. It would be that multitudinous lawsuits by victims of bad weather would be a lunatic method of trying to improve the accuracy of weather forecasting. Cf. *Clarke v. Securities Industry Ass'n, supra*, 479 U.S. at 399, 107 S.Ct. at 757; *Block v. Community Nutrition Institute, supra*, 467 U.S. at 348, 104 S.Ct. at

2455. We would say that the statutes establishing and governing the Weather Bureau should not be understood to confer *litigable* rights on persons complaining of being injured as a result of inaccurate weather forecasts, although those statutes were intended to *benefit* those persons.

The failure to count a person in the census enumeration may be a graver failure of good government than the Weather Bureau's failure to keep up with the latest techniques of weather forecasting. The plaintiffs' counsel reminded us at argument that ever since the original Constitution provided that slaves would be counted for representation purposes as three-fifths of free persons, undercounting has been a politically and morally sensitive issue, even though the purpose of the provision was not to denigrate blacks but to reduce the congressional representation of their white masters. Yet the question remains whether the various provisions invoked by the plaintiffs should be construed to authorize suits for judicial review of inaccurate census determinations, and our answer is no. The decennial census is a part—maybe the most important part, but a part nevertheless—of a vast federal activity of collecting and publishing statistics. Every methodological decision made in the government's statistical programs has a potentially adverse impact on some, perhaps many, persons. Industry concentration ratios compiled by the Census Bureau are used in antitrust cases. See, e.g., *United States v. Continental Can Co.*, 378 U.S. 441, 459 n. 10, 84 S.Ct. 1738, 1748 n. 10, 12 L.Ed.2d 953 (1964). The Consumer Price Index, which is compiled by another federal statistical agency, the Bureau of Labor Statistics, is incorporated by reference in innumerable contracts that contain cost of living provisions. See, e.g., *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 538, 103 S.Ct. 2541, 2551, 76 L.Ed.2d 768 (1983). Financial statistics published by various federal agencies are likewise often incorporated by reference in contracts. Racial statistics collected by the Census Bureau are used as evidence in employment discrimination cases. See, e.g., *Hazelwood School District v. United States*, 433 U.S. 299, 303, 97 S.Ct. 2736, 2739, 53 L.Ed.2d

768 (1977). Since corporations use population statistics when making plans about future office and plant locations, census statistics can affect the distribution of employment opportunities. Note, "Constitutional Implications of a Population Undercount: Making Sense of the Census Clause," 69 *Geo.L.J.* 1427, 1432 n. 34 (1981). Why, there may even be people who have relied to their detriment on misinformation contained in "Gloves and Mittens: 1988," listed in the Census Bureau's *Census Catalog & Guide 1991*, at p. 120. Forget mittens; it would be absurd to suppose that a person who had an employment contract that contained a cost of living clause could sue the Department of Labor, arguing that the Department had, by measuring the cost of living inaccurately, cost him a raise. But that is what the logic of this lawsuit implies.

It might be different if the apportionment clause, the census statutes, or the Administrative Procedure Act contained guidelines for an accurate decennial census, for that would be some evidence that the framers of these various enactments had been trying to create a judicially administrable standard. There is nothing of that sort, and the inference is that these enactments do not create justiciable rights. The Constitution directs Congress to conduct a decennial census, and the implementing statutes delegate this authority to the Census Bureau. U.S. Const. Art. I, § 2, cl. 3; 2 U.S.C. § 2a; 13 U.S.C. § 141. There is a little more to the statutes—they specify a timetable, and a procedure for translating fractional into whole seats—but they say nothing about how to conduct a census or what to do about undercounts. So nondirective are the relevant statutes that it is arguable that there is no law for a court to apply in a case like this, *Webster v. Doe*, 486 U.S. 592, 599–600, 108 S.Ct. 2047, 2051–52, 100 L.Ed.2d 632 (1988); *Heckler v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); *Scalise v. Thornburgh*, 891 F.2d 640, 648–49 (7th Cir.1989); *Achacoso-Sanchez v. INS*, 779 F.2d 1260, 1264–65 (7th Cir.1985)—that you might as well turn

it over to a panel of statisticians and political scientists and let them make the decision, for all that a court could do to add to its rationality or fairness.

It would be otherwise if this suit were based on a concern with discrimination rather than with innocent inaccuracy. (The counterpart in weather forecasting would be a suit for misrepresentation—and there *has* been such a suit, albeit against a private forecaster. *Grossman v. Citrus Associates,* 706 F.Supp. 221, 233–36 (S.D.N.Y. 1989).) We may assume that the Fifth Amendment authorizes courts to review census decisions argued to constitute invidious discrimination. We might even have a different case if the challenge were not to the Census Bureau's statistical methodology but to some categorical judgment of inclusion or exclusion argued to be in violation of history, logic, and common sense, as in *Massachusetts v. Mosbacher,* 785 F.Supp. 230 (D.Mass.1992) (3–judge court), where, the court found, the Bureau had, in inexplicable reliance on a study planned but never conducted, changed its historic practice of not trying to allocate overseas federal personnel to individual states. Maybe, in such a case, history, and logic, and common sense provide adequate materials for a lawlike judgment, though we have our doubts about both the provenance and the practicability of the right enforced in that case. But however that may be, merely by directing congressional apportionment in accordance with the decennial census, Article I, section 2, clause 3 does not authorize lawsuits founded on disagreement with the Census Bureau's statistical methodology.

The reapportionment cases do not dictate a contrary result, though they do authorize the courts to intervene in the process of apportioning representatives, even to the extent of reviewing the methods by which the states determine the population of their electoral districts, *Kirkpatrick v. Preisler,* 394 U.S. 526, 535, 89 S.Ct. 1225, 1231, 22 L.Ed.2d 519 (1969); *Burns v. Richardson,* 384 U.S. 73, 91–92, 86 S.Ct. 1286, 1296, 16 L.Ed.2d 376 (1966); *Young v. Klutznick, supra,* 652 F.2d at 624, so far as that is necessary to assure equal voting power to every voter. Equality of voting power is an administrable standard; indeed, the most common argument against it is that it sacrifices flexibility in adjusting voting power to legitimate social or political interests (for example, the interest in enhancing the voting power of an isolated minority) on the altar of administrative simplicity. *Reynolds v. Sims,* 377 U.S. 533, 589, 622–23, 84 S.Ct. 1362, 1395, 1413, 12 L.Ed.2d 506 (1964) (Harlan, J., dissenting). The plaintiffs' claim to a census adjustment invokes no judicially administrable standards. The plaintiffs are not asking us to decree equality. They are asking us to take sides in a dispute among statisticians, demographers, and census officials concerning the desirability of making a statistical adjustment to the census headcount.

Another difference between this case and the reapportionment cases is that the decennial census doesn't count just voters or even just people eligible to vote. In fact the undercount is concentrated among persons who either cannot vote (illegal aliens) or are unlikely to vote (a smaller fraction of poor than of affluent people vote). So this is not a case about depriving anybody of his right to vote or about diluting his voting power. If anything, the undercount enhances the political power of voters relative to that of nonvoters, by making their number decisive (or more decisive) in the apportionment of congressional representation and other political benefits. That was the ground on which the plaintiffs in *Federation for American Immigration Reform v. Klutznick, supra,* challenged the *inclusion* of illegal aliens in the decennial count. (An old issue. Margo J. Anderson, *The American Census: A Social History* 131–58 (1988).) They *wanted* an undercount, to enhance their own voting power.

Not only because population shifts over a ten-year period, *Kirkpatrick v. Preisler, supra,* 394 U.S. at 535, 89 S.Ct. at 1231, but also because population and voting population are not the same, states are not required to use census figures for the apportionment of their legislatures. *Burns v. Richardson, supra,* 384 U.S. at 92–97, 86 S.Ct. at 1296–99. Realistically, it is true, a census undercount may reduce the voting power of voters who are the natural allies

of the undercounted, since an adjustment might give more representation to voters in states in which the undercounted are concentrated. But that is the kind of realism the Supreme Court rejected when it adopted the principle of "one man, one vote" over objections that malapportionment might actually increase the power of a minority by diluting the voting power of its opponents. See, e.g., *Kirkpatrick v. Preisler, supra,* 394 U.S. at 533–34, 89 S.Ct. at 1230. Correcting the undercount might actually offend against that principle, by creating disparities in voting power based not on differences in the number of voters but on differences in the number of nonvoters. On the other hand, it can be argued that people, not just voters, are entitled to equal representation, *Federation for American Immigration Reform v. Klutznick, supra,* 486 F.Supp. at 577 n. 16, consistent with the Constitution's reference to apportioning congressional representation by "Numbers" (of people). Cf. *Wesberry v. Sanders, supra,* 376 U.S. at 18, 84 S.Ct. at 535; *Kirkpatrick v. Preisler, supra,* 394 U.S. at 534, 89 S.Ct. at 1230. But all this is an aside. The dispositive consideration in this case is that, though even fine points of statistical methodology can have real consequences, a case about statistical methodology is a case whose gears fail to mesh with any judicially enforceable federal rights.

AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I concur in the judgment of the court. In my view, to the extent that the plaintiffs seek a redetermination of the Congress' apportionment of the seats of the House of Representatives, this suit presents a nonjusticiable political question. *See Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). The Constitution squarely places sole responsibility for this fundamental function of government on the Congress. U.S. Const. art. I, § 2; *cf. McIntyre v. Fallahay,* 766 F.2d 1078, 1081 (7th Cir.1985) (dispute arising out of congressional recount nonjusticiable in light of U.S. Const. art. I § 5, cl. 1).

To the extent that the plaintiffs seek an order directing the Secretary of Commerce to present the Congress with a revised count of the Nation's population, the plain language of the governing statute makes it clear that the matter is committed to agency discretion. *See Webster v. Doe,* 486 U.S. 592, 599–601, 108 S.Ct. 2047, 2051–52, 100 L.Ed.2d 632 (1988); *Heckler v. Chaney,* 470 U.S. 821, 827–35, 105 S.Ct. 1649, 1653–57, 84 L.Ed.2d 714 (1985). There is "no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (citing S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)).