UNITED STATES of America,
Plaintiff–Appellee,

v.

Bertha Alicia ESQUIVEL,
Defendant–Appellant.

No. 94–50603.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 14, 1995.

Decided Jan. 30, 1996.

Stephen R. Scarborough, Federal Defenders of San Diego, Inc., San Diego, California, for defendant-appellant.

Roger W. Haines, Jr. (argued), and Alberto A. Arevalo (on the brief), Assistant United States Attorneys, San Diego, California, for plaintiff-appellee.

## OPINION

T.G. NELSON, Circuit Judge:

Bertha Alicia Esquivel was arrested on June 2, 1994, at the Port of Entry at San Ysidro, California, when port authorities discovered a Mexican national hidden in Esquivel's car. A federal grand jury issued a one-count indictment against Esquivel. The indictment charged Esquivel with bringing an illegal alien into the United States, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and (iii).

Esquivel made a motion to dismiss the indictment on the ground that the grand jury which issued the indictment was selected in an unconstitutional manner. The motion was denied, and after a two-day trial, the jury returned a guilty verdict. Esquivel appeals the district court's denial of her motion to dismiss. We AFFIRM.

## DISCUSSION

I. Jury Selection

A. Background

■ Under the Sixth Amendment of the United States Constitution and the Federal Jury Service and Selection Act of 1968 ("JSSA"), 28 U.S.C. §§ 1861–78, a criminal defendant is guaranteed the right to be tried by an impartial jury drawn from a representative cross section of the community. This constitutional guarantee applies to both grand and petit juries. The Sixth Amend-

ment provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed. . . ." U.S. Const. Amend. VI. This guarantee, as interpreted by the Supreme Court, "necessarily contemplates an impartial jury drawn from a cross-section of the community." *Thiel v. Southern Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946). However,

> [t]his does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups.

*Id.*

In 1968, Congress enacted the JSSA in response to numerous complaints of racial discrimination in the selection of potential jurors.[1] The stated policy of the JSSA is that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. Further, Congress set forth the method by which the stated policy was to be implemented. In section 1863(b)(2) of the JSSA, Congress designated voter registration lists (or the lists of actual voters) as the main source for selecting potential jurors. However, Congress also provided that the districts could prescribe other sources of names in addition to voter lists if necessary. *Id.*

■ There have been two types of constitutional challenges to jury selection methods. The first is an equal protection challenge under the Fourteenth Amendment, and the second is a fair representation challenge under the Sixth Amendment. In order to establish a prima facie equal protection violation in the jury selection process,

---

1. *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

an appellant "must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977).

In *Castaneda*, the Supreme Court articulated a three-step process for establishing a prima facie equal protection case: (1) establish that the group, of which the appellant is a member, is "one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied;" (2) prove the degree of underrepresentation "by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time;" and (3) discriminatory intent. *Id.* at 494, 97 S.Ct. at 1280. The third step, discriminatory intent, may be established by showing that a selection procedure "is susceptible of abuse or is not racially neutral," thus supporting the presumption of discrimination raised by the statistical showing under step two. *Id.* "Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case." *Id.* at 495, 97 S.Ct. at 1280. In order to rebut the presumption of unconstitutional action, the state must show " 'that permissible racially neutral selection criteria and procedures have produced the monochromatic result.' " *Id.* at 494, 97 S.Ct. at 1280 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972)).

In contrast, a prima facie case for establishing a Sixth Amendment, fair cross-section violation does not require the appellant to prove discriminatory intent or require that the appellant be a member of the "distinct," excluded group. *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). In *Duren*, the Supreme Court formulated a three-pronged test for establishing a prima facie violation of the Sixth Amendment fair cross-section requirement:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in

venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

*Id.* at 364, 99 S.Ct. at 668.

### B. Sixth Amendment

Esquivel challenges the constitutionality of her indictment on the ground that the jury selection procedure in the Southern District of California violates the fair cross-section requirement of the Sixth Amendment. She argues that although drawing potential jurors from voter registration lists (or the lists of actual voters) may comply with the JSSA, the exclusive use of those lists result in an underrepresentation of Hispanics in the jury pool.

Esquivel has met the first prong of the *Duren* test. Hispanics have been recognized as a "distinctive," "cognizable" group for purposes of the fair cross-section analysis. *Castaneda*, 430 U.S. at 482, 97 S.Ct. at 1273–74.

The second prong of the *Duren* test requires proof, typically statistical data, that the jury pool does not adequately represent the distinctive group in relation to the number of such persons in the community. We have been confronted with this issue before and have adopted the "absolute disparity" test for measuring the representativeness of a distinctive group in a jury pool. *United States v. Sanchez–Lopez*, 879 F.2d 541, 547 (9th Cir.1989). Absolute disparity is determined "by taking the percentage of the group at issue in the total population and subtracting from it the percentage of that group that is represented on the master jury wheel." *Id.*

Esquivel presented census information which indicated that in 1990, 22.3 percent of the population in San Diego and Imperial Counties was Hispanic. Based on the census data from 1980 and 1990, Esquivel's expert witness on demographics, John R. Weeks, estimated that in 1993, 24.2 percent of the population in San Diego and Imperial Counties was Hispanic. Esquivel then proffered

the results of a 1993 study conducted by the Federal Defenders of San Diego, Inc., which indicated that Hispanics comprised 9.7 percent of the master wheel from which juries were selected. Thus, according to the statistics presented, the absolute disparity of Hispanics in the jury pool in 1993 was 14.5 percent (24.2–9.7). Esquivel argues that a 14.5 percent absolute disparity demonstrates a statistically significant underrepresentation of Hispanics which shifted to the Government the burden of showing that a significant state interest is manifestly and primarily advanced by the mechanism causing the underrepresentation. *Duren*, 439 U.S. at 367–68, 99 S.Ct. at 670–71.

In opposition, the Government argued in the district court that the statistical evidence presented by Esquivel is flawed because it used the total population of Hispanics in the counties rather than the number of Hispanics eligible to serve as jurors. The district judge found that Esquivel's proffered statistic of absolute disparity between the number of Hispanics on the master jury list and the number of Hispanics in the community did "not contemplate the number of those who are not eligible for selection on a jury."

Under 28 U.S.C. § 1865(b)(1), in order to qualify as a juror an individual must be a citizen, be at least 18 years old, and have resided for at least one year within the judicial district. Further, the individual must also be able to speak, read, write and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form. *Id.* § 1865(b)(2), (3).

In *Sanchez–Lopez*, the Government made a similar challenge to the accuracy of the data presented by the appellant. The district court in *Sanchez–Lopez* also "expressed grave concerns about the accuracy of appellants' proof. . . ." 879 F.2d at 547. But because the Government did not present any evidence to contradict the appellants' figures, we assumed for purposes of our analysis that the appellants' statistics were valid. *Id.* However, in *Sanchez–Lopez*, the absolute disparity, even based on total population figures, was so low (2.05 percent) that the issue

regarding the significance of the absolute disparity was not a close call.

■■■ On appeal, the Government requests us to take judicial notice of 1990 census data showing the number of Hispanics eligible for jury service. In opposition, Esquivel argues that to take judicial notice of the Government's census data, presented for the first time on appeal, "would be to short-circuit the factfinding process and to compromise the evidence used by the [district] court. . . ." Esquivel's argument is not compelling given that the Government's evidence is of the same type and taken from the same source—the United States Department of Commerce, Bureau of the Census—as her own. Further, the census documents meet the requirements of Rule 201(b), Fed.R.Evid., in that they are "not subject to reasonable dispute" because they are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

According to this census data, in 1990, the percentage of Hispanics in the Southern District of California who are *eligible to vote* is 14.6 percent as opposed to the 22.3 percent of the total Hispanic population. Therefore, the absolute disparity is 4.9 percent (14.6–9.7), rather than 14.5 percent under the total population figures. This means that Esquivel's computation, based on the total population of Hispanics, is inaccurate and overestimated.

A general examination of cases on this issue indicates that the second prong of the *Duren* test is violated by a showing of an absolute disparity in the neighborhood of twenty or more percentage points. *See Turner v. Fouche*, 396 U.S. 346, 359, 90 S.Ct. 532, 539–40, 24 L.Ed.2d 567 (1970) (23 percent); *Gibson v. Zant*, 705 F.2d 1543, 1547 (11th Cir.1983) (20 percent and 38 percent); *United States v. Suttiswad*, 696 F.2d 645, 649 (9th Cir.1982) (7.7 percent absolute disparity deemed insubstantial and constitutionally permissible).

Moreover, the census data offered by the Government shows that ⅔ of the disparity between Hispanics in the population and the jury wheel disappears when readily available data relating to jury eligibility is taken into account. This amounts, in practical terms, to

about the same thing as the district court did, which was to reject Mr. Weeks' statistics as insufficiently probative because they "did not contemplate the number of those who are not eligible for selection on a jury."

The defense statistician conspicuously failed to compare the percentage of Hispanics on the jury wheel with the number of Hispanics in the population who were eligible for jury service, under 28 U.S.C. § 1865(b). Non-citizens and non-English speakers would be ineligible under the statute. *See* 28 U.S.C. § 1865(b)(1), (2), and (3). In cases when general population figures have been used without this refinement, there was no reason to suppose there would be any difference, or the difference would not matter to the outcome. *See Duren,* 439 U.S. at 364–65, 99 S.Ct. at 668–69 (accepting 1970 census data to establish the number of women in the community); *Sanchez–Lopez,* 879 F.2d at 547 (we assumed for purposes of analysis that general population statistics were relevant, where disparity was only 3%).

The Southern District of California consists of two counties just north of the border with a Spanish speaking country. Thus, it is probable that quite a few Hispanic people in the district will not yet have attained citizenship or fluency in English. In fact, as the census materials establish, when persons ineligible to vote, such as non-citizens, are subtracted, ⅔ of the apparent disparity is eliminated.

■ To make out a prima facie case, a person challenging the representativeness of the wheel should, to the extent practicable, where there is reason to suppose that the jury eligible percentage of the group at issue will differ from its share of the general population, "compare the difference between the percentage of the distinctive group among the population *eligible for jury service* and the percentage of the distinctive group [on the qualified jury wheel]." *United States v. Grisham,* 63 F.3d 1074, 1078 (11th Cir.1995) (emphasis added), *cert. denied,* —— U.S. ——, 116 S.Ct. 798, 133 L.Ed.2d 746 (1996); *United States v. Cannady,* 54 F.3d 544, 548 (9th Cir.) (Defendants can prove a violation of the second prong of the *Duren* test by showing underrepresentation "as compared

with the number of eligible minorities" in the district), *cert. denied,* —— U.S. ——, 116 S.Ct. 210, 133 L.Ed.2d 142 (1995); *Ramseur v. Beyer,* 983 F.2d 1215, 1231 (3rd Cir.1992) ("Absolute disparity in the jury selection context is defined as the difference between the percentage of a certain population group eligible for jury duty and the percentage of that group who actually appear in the venire."), *cert. denied,* 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993); *United States v. Lewis,* 10 F.3d 1086, 1090 (4th Cir.1993) (similar language).

■ Although the Government could and should have presented the refined census material in the district court, in the interest of judicial efficiency, and notwithstanding Esquivel's argument based on her statistical data, we take judicial notice on appeal of the Government's census data where it is presented to rebut similar data presented by Esquivel. Fed.R.Evid. 201. Upon so doing, we hold that Esquivel has failed to make a prima facie case of a Sixth Amendment violation.

### C. Equal Protection

■ Esquivel also alleges that the jury selection procedure is an equal protection violation. In order to establish a prima facie case for an equal protection violation, Esquivel must "establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280. In this case, although Hispanics are recognized as a distinct class, Esquivel has not presented any evidence to show that they are singled out for different treatment under the laws. Further, the most crucial factor in an equal protection case is a showing of discriminatory intent. If a selection procedure is susceptible of abuse or is not racially neutral, then that supports the presumption of discrimination raised by the statistical showing. Unlike *Castaneda* or *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), where the Supreme Court held that there was a presumption of discrimination in the jury selection procedure, there is no evidence in this case that indicates that the jury selection procedure is susceptible of abuse or is not racially neutral.

In *Castaneda,* the jury selection method was the "key-man" system. Under the "key-man" system, the jury commissioners personally select between fifteen and twenty citizens from the community to be members of the jury pool. 430 U.S. at 484, 97 S.Ct. at 1275. The grand jury is then selected from that group. Although the "key-man" system was deemed constitutional at that time,[2] the Court noted that the "key-man" system was "highly subjective" and susceptible of abuse. *Id.* at 497, 97 S.Ct. at 1281–82. Thus, the Court found that the appellant had established a prima facie case for an equal protection violation case.

In *Alexander,* the jury commissioners, who were appointed by the court, compiled a list of names from various sources (telephone directories, voter lists, and lists compiled by the jury commissioners themselves). 405 U.S. at 627, 92 S.Ct. at 1223–24. Questionnaires were then sent to the persons whose names the commissioners picked. *Id.* The questionnaires included spaces for the recipients to indicate their race. *Id.* Once a questionnaire was returned, the commissioners attached to each questionnaire a card designating, among other things, the race of the potential juror. *Id.* at 628, 92 S.Ct. at 1224. The commissioners then "culled" out approximately 2,000 of the 7,374 returned questionnaires, "ostensibly on the ground that these persons were not qualified for grand jury service or were exempted under state law." *Id.* With the remaining 2,000 questionnaires, the commissioners placed them on a table and "randomly" selected 400 to be placed in a box from which the grand jury panels were drawn. The Court found that [t]he racial designation on both the questionnaires and the information cards provided a clear and easy opportunity for racial discrimination. *Id.* at 630, 92 S.Ct. at 1225.

Citing *Turner v. Fouche,* Esquivel argues that any substantial disparity over a period of time between a group's percentage on the jury and its percentage in the eligible population is prima facie evidence of discrimination, *regardless of the source of jurors.* However, reading *Turner* in its entirety indicates that

the Court determined that although the jury commissioners utilized the voter list as the original source for compiling the jury pool, the commissioners invoked their subjective judgment rather than objective criteria in the selection process of the actual jury pool. 396 U.S. at 360, 90 S.Ct. at 540.

The jury selection method used in the Southern District of California is that which is prescribed by the JSSA. Without any evidence that there was discriminatory intent in the selection process, Esquivel's equal protection challenge must fail.

Reconsideration of the order granting the motion to take judicial notice is DENIED.

AFFIRMED.

BOOCHEVER, Circuit Judge, partial concurrence and partial dissent:

If we take judicial notice of 1990 census data showing the number of Hispanics eligible for jury service, which was presented to us two weeks before the oral arguments on this appeal, I would agree with the majority's opinion holding that Esquivel has failed to make a prima facie case of a Sixth Amendment violation. Esquivel opposed the request contending that the late presentation did not afford her the opportunity to confer with experts and to place experts' opinions before the court.

If this case merely affected Esquivel, I would have no hesitancy in joining the majority opinion, but it affects the jury representation of a "distinctive," "cognizable" group whose numbers are between one-fourth and one-third of the residents of the Southern District of California. In order to preserve the appearance of fairness and to recognize the interest of this sizable group of residents, I believe that the better procedure is to remand the judicial notice request to the district court so that Esquivel has a full opportunity to challenge the figures.

I note that in a case from the U.S. Court of Appeals for the Second Circuit, the Supreme Court has granted certiorari to review the government's refusal to correct alleged errors in the 1990 census count concerning omissions of a disproportionate number of Black and Hispanic residents of large cities.

**2.** The "key-man" system was not expressly re-

jected until the JSSA was passed.

*See City of N.Y. v. United States Dep't of Commerce,* 34 F.3d 1114 (2d Cir.1994), *cert. granted sub nom., Wisconsin v. City of N.Y.,* —— U.S. ——, 116 S.Ct. 38, 132 L.Ed.2d 919 (1995).

If it were not for the additional statistics presented in the request to take judicial notice, this would present a very close case of whether there was sufficient statistical representation to place the burden on the government for an explanation. *Compare Turner v. Fouche,* 396 U.S. 346, 359, 90 S.Ct. 532, 539–40, 24 L.Ed.2d 567 (1970) (disparity of 23% sufficient to create presumption); *Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 646–47, 17 L.Ed.2d 599 (1967) (18%); *Gibson v. Zant,* 705 F.2d 1543, 1547 (11th Cir.1983) (20%) *with United States v. Sanchez–Lopez,* 879 F.2d 541, 547 (9th Cir.1989) (disparity of 2.8% insufficient to create presumption); *United States v. Rodriguez,* 776 F.2d 1509, 1511 (11th Cir.1985) (6.7%); *United States v. Suttiswad,* 696 F.2d 645, 648 (9th Cir.1982) (7.7%). It will be unnecessary for us to determine whether a threshold lower than that relied upon in previous cases is sufficient, if the request for judicial notice is granted. I, however, believe that the preferable course is a remand.