THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FAZAL OMAR, Defendant-Appellant.

Second District No. 2—94—1087

Opinion filed June 7, 1996.

408

G. Joseph Weller, Bonnie J. Bondavalli, and Steven E. Wiltgen, all of

State Appellate Defender's Office, of Elgin, and Charles M. Schiedel and John J. Hanlon, both of State Appellate Defender's Office, of Springfield, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, Fazal Omar, appeals the verdict of the circuit court of Lake County which found him guilty of two counts of unlawful possession of a controlled substance (720 ILCS 570/402 (West 1994)). We affirm.

Defendant was charged with two counts of unlawful possession of a controlled substance as a result of events which occurred on the night of February 12, 1994. On that night, several members of the Waukegan and Park City police departments were present at the Stardust Motel in Park City. Officers Michael Taylor, David Mercado, and Michael Szuchnicki testified that they were inside a motel room at the Stardust Motel. The front door was open and the parking lot was illuminated by a streetlight. A car pulled up and defendant got out. Defendant began to walk towards the motel room where the officers were, at which point Officer Taylor approached defendant and asked him to take his hands out of his pockets. Defendant obliged, but then proceeded to throw two small objects into a snowbank.

Officer Mercado saw defendant throw the objects, and the officer went over and retrieved the objects from the snowbank. One of the objects was a napkin which had two small plastic baggies inside. The baggies contained a rock-like white substance. The other object was a larger plastic bag, which contained a white rocky substance. Officer Mercado turned the objects over to Officer Szuchnicki.

Officer Szuchnicki also saw defendant throw some objects, although he did not see where they fell. Officer Mercado handed Officer Szuchnicki the bags containing the white substances. Officer Szuchnicki was not sure what was in the bags, so he field tested the substances using Valtox, a cobalt reagent. The Valtox turned blue, which was indicative that the samples were cocaine. Officer Szuchnicki then sealed both objects in separate envelopes and placed the envelopes in an evidence bag.

The evidence bag was placed in the evidence vault at the Waukegan police station. The evidence custodian later removed the bag from the vault and took the bag to the Northern Illinois Police Crime Laboratory for further testing. Upon arrival at the laboratory, the

secretary at the crime laboratory signed for the evidence. Chris Hedges, a forensic scientist with the laboratory, received the evidence bag with the sealed envelopes. He then opened the envelopes and proceeded to test the substances.

Mr. Hedges indicated that the larger package contained a clump of white powdery material. Mr. Hedges first tested the package using a cobalt reagent, which was similar to the Valtox testing reagent used by Officer Szuchnicki. The reagent turned a blue color, which could indicate that the package contained cocaine. However, Mr. Hedges proceeded to further test the first package. The additional test results indicated that the package might contain heroin mixed with diphenhydramine. Diphenhydramine is a white, powder-like substance which is often mixed with heroin to increase the heroin's street value. Mr. Hedges indicated that the diphenhydramine would also yield a blue result when mixed with a cobalt reagent and thus would explain the blue result from Mr. Hedges' and Officer Szuchnicki's initial tests.

Mr. Hedges proceeded to further test the larger package by placing it in a gas chromatograph mass spectrometer (GCMS). The GCMS compares various attributes of the unknown substance to the attributes of a known substance and then determines which substance the unknown substance best matches. The test returned a score of 9,580 out of 10,000 that the substance was heroin, which led Mr. Hedges to conclude, in his expert opinion, to a reasonable degree of scientific certainty, that the package contained heroin. The next closest possible substance returned a score of 6,651 out of 10,000.

Mr. Hedges also tested the smaller package in the GCMS, and the test returned a score of 9,917 out of 10,000 that the substance was cocaine. Mr. Hedges concluded that the substance in the smaller package was cocaine.

The jury returned a verdict of guilty on both counts, and defendant was sentenced to two years' imprisonment. On appeal, defendant argues that the evidence presented was insufficient to prove defendant guilty beyond a reasonable doubt. Defendant further argues that he was denied a fair trial as a result of the State's alleged improper gestures and remarks during closing argument. Lastly, defendant contends that the makeup of the jury venire was such as to violate defendant's sixth and fourteenth amendment rights, as well as defendant's right to equal protection.

We turn now to defendant's first argument. Defendant argues that he was not proved guilty beyond a reasonable doubt because the State's case was filled with inconsistent and incredible testimony. Specifically, defendant notes that Officers Taylor, Mercado, and

Szuchnicki testified that the larger package retrieved from the snowdrift (heroin) was a large, white, rock-like substance, while Mr. Hedges testified that it was a clump of a powder-like substance. Further, defendant notes that the officers testified that the substance had tested positive for cocaine although expert testimony established that the substance was heroin. Defendant also contends that the officers' testimony differed as to where exactly defendant had been standing when he threw the objects into the snowbank and that the officers' testimony also differed as to the quality, quantity, and location of the lighting outside the motel room.

It is the jury's responsibility to resolve any factual disputes, to assess the credibility of the witnesses, and to determine the sufficiency of the evidence in support of a verdict of guilty. *People v. Bradford*, 106 Ill. 2d 492, 502 (1985). A reviewing court will reverse a conviction only if the evidence is so unsatisfactory as to raise a reasonable doubt of defendant's guilt. *People v. Johnson*, 191 Ill. App. 3d 940, 947 (1989).

■ In the case at bar, the officers did testify that the package containing the heroin contained a rocky substance which field tested as cocaine. Mr. Hedges testified, however, that the substance was a clump of white powdery material which turned out to be heroin. Mr. Hedges also testified that the heroin contained diphenhydramine, a substance which, when tested with a cobalt reagent, will cause the reagent to turn blue. The mere fact that the police officers described the substance as a white, rock-like substance while a forensic scientist testified that it was a clump of white powdery material does not render the evidence so unsatisfactory as to raise a reasonable doubt as to defendant's guilt. Further, Mr. Hedges provided an entirely plausible explanation as to why the heroin field tested as cocaine.

We have examined the record in its entirety and find that the officers all agreed that the parking lot was well illuminated and all three officers testified that defendant threw two objects towards the snowbank. While the officers' testimony may not have been identical as to the number and the exact location of the lights in the parking lot and where exactly defendant was standing when he threw the objects, the evidence as a whole was not so unsatisfactory as to raise a reasonable doubt of defendant's guilt.

Defendant next argues that he was denied a fair trial because of the prosecutor's alleged improper gestures and remarks during closing argument. During closing argument, the prosecutor stated:

> "Ladies and gentlemen, look over here. All thirteen of you sitting in that box look right here. Fazal Omar, the defendant. Now, ladies and gentlemen, follow me over here for a minute. The wit-

ness stand. The evidence, ladies and gentlemen, comes from the witnesses. The evidence, ladies and gentlemen, comes from the exhibits. Look over here for a moment.

\* \* \*

[Defense counsel objects to the prosecutor pointing his finger at defense counsel.]

Ladies and gentlemen, the evidence doesn't come from Mr. Stone's mouth. The evidence doesn't come from my mouth. The evidence doesn't come from Mr. Pinsel's mouth. It comes from the witnesses. And that's what you need to look at, ladies and gentlemen, the evidence."

During closing argument, the prosecutor may denounce the accused, reflect upon witness credibility, and urge the fearless administration of law if it is based on facts in the record or inferences fairly drawn from those facts. *People v. Bryant*, 94 Ill. 2d 514, 523-24 (1983). However, a prosecutor may not make a reference intended to direct the attention of the jury to the defendant's failure to testify. *People v. Tate*, 156 Ill. App. 3d 950, 953 (1987). Such references can also include gestures and visual displays as well as verbal comments. *People v. Johnson*, 102 Ill. App. 3d 122, 128-29 (1981).

■ We have examined the complained-of comments and determine that they were not directed towards defendant's silence. Rather, as the State argued, the prosecutor was merely demonstrating that the evidence was supposed to come from the witnesses on the witness stand and not from the attorneys.

The cases cited by defendant in support of his argument that the prosecutor's remarks were improper involve instances where the prosecutor made specific reference to the defendant and the defendant's silence. For example, in *People v. Tipton*, 222 Ill. App. 3d 657, 661 (1991), the prosecutor specifically stated: " 'Where that object ended up we'll never know. [The defendant] knows. We'll never know \*\*\*.' " The court found the reference to the defendant coupled with the implication that the defendant could have explained where the object was to be improper. *Tipton*, 222 Ill. App. 3d at 662.

Similarly, in *Tate*, 156 Ill. App. 3d at 952-53, the prosecutor referred to the fact that the jury had not heard any direct evidence concerning the defendant's intent to defraud, but that the only person who could provide that evidence was the defendant, who did not testify. Again, the court determined that the prosecutor's mention of the defendant and defendant's knowledge concerning his intent, as well as the prosecutor's reference to the defendant's failure to present evidence, to be sufficient to warrant reversal. *Tate*, 156 Ill. App. 3d at 952-54.

In the case at bar, the prosecutor was responding to defense counsel's rather impassioned closing argument in which he repeatedly compared the police officers to Jihad soldiers in a war on drugs. Although the prosecutor did mention defendant's name, the prosecutor did not make any statement which could be construed as being directed against defendant's failure to testify. Rather, we find that the comments were designed to emphasize the fact that the evidence came from the witnesses on the witness stand, and not from either attorney, especially in light of some of defense counsel's comments throughout the trial. After reviewing the context of the prosecutor's closing argument, we find that the prosecutor's comments were not intended or calculated to direct the attention of the jury to defendant's failure to testify.

Additionally, we note that defendant failed to object to the State's comments during closing argument. The only objection made was when the prosecutor pointed his finger at defense counsel, whereupon defense counsel objected to the prosecutor pointing his finger at him in a court of law. After the court reminded the attorneys to be polite, the prosecutor proceeded with closing arguments without further objection. Thus, we could also view this argument waived. See *Tate*, 156 Ill. App. 3d at 954.

■ Lastly, defendant argues that because there was only one African-American in the jury venire, he was denied his sixth and fourteenth amendment constitutional rights to a grand and petit jury drawn from a fair cross-section of the community. U.S. Const., amends. VI, XIV. In order to establish a *prima facie* violation of the fair cross-section requirement, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 58 L. Ed. 2d 579, 586-87, 99 S. Ct. 664, 668 (1979).

■ We agree that defendant met the first prong of the *Duren* test. Defendant is an African-American, and African-Americans are "distinctive" for purposes of the *Duren* test. See *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149, 106 S. Ct. 1758, 1766 (1986).

The second part of the *Duren* test requires proof that the jury pool does not adequately represent the distinctive group in relation to the number of such persons in the community. *United States v. Esquivel*, 75 F.3d 545, 548 (9th Cir. 1996). There are two separate tests which courts have employed in determining whether the venire adequately represents the distinctive group.

The first test, the "absolute disparity" test, takes the percentage of the group at issue in the total population and subtracts from that percentage the percentage of that group which is represented on the master jury wheel. See *Esquivel*, 75 F.3d at 548. The second test, the "comparative disparity" test, takes the percentage of representation in the jury pool and subtracts that from the percentage of the group at issue in the total population, divides that difference by the percentage of representation in the community, and multiplies that by 100 to obtain a percentage result. *United States v. Rogers*, 73 F.3d 774, 776 n.1 (8th Cir. 1996). While there appears to exist a discrepancy among several federal circuits, the majority of circuits have utilized the "absolute disparity" test in analyzing a defendant's challenge to a jury venire. See, *e.g., Esquivel*, 75 F.3d at 548 (9th Cir.); *Rogers*, 73 F.3d at 776-77 (9th Cir.); *United States v. Ashley*, 54 F.3d 311, 313-14 (7th Cir. 1995); *United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990); *United States v. Hafen*, 726 F.2d 21, 23 (1st Cir. 1984). While we acknowledge that the decisions of the federal courts are merely persuasive authority (*People v. Qualls*, 233 Ill. App. 3d 394, 397 (1992), we find the better rule to be the "absolute disparity" test.

There may be some circumstances in which the "comparative disparity" test might be a useful *supplement* to the "absolute disparity" test. However, where the group allegedly underrepresented forms a small proportion of the total population, then the "absolute disparity" test is more appropriate. See *Hafen*, 726 F.2d at 24. The smaller the underrepresented group is in the community, the more the "comparative disparity" test distorts the proportional representation. *Hafen*, 726 F.2d at 24. For example, in an area with 100,000 non-African-American people and only 10 African-Americans eligible to serve as jurors, a random selection that failed to place a single African-American on the jury would result in a 100% comparative disparity even though the all non-African-American jury would clearly form a fair cross-section of the community. *Hafen*, 726 F.2d at 24.

Thus, we will utilize the "absolute disparity" test in analyzing defendant's challenge to the jury-selection process in Lake County. Utilizing defendant's representations, the percentage of African-Americans in Lake County is approximately 12%. Further, defendant represented that the jury venire was 3.4% African-American. Thus, the absolute disparity is approximately 8.6%. An absolute disparity of less than 10%, by itself, is insufficient to demonstrate unfair or unreasonable representation of African-Americans on the venire without defendant also tying that disparity to something other than coincidence. See *Esquivel*, 75 F.3d at 549; *Ashley*, 54 F.3d at 313-14.

Defendant has not met the second prong of the *Duren* test. *Duren*, 439 U.S. at 364, 58 L. Ed. 2d at 587, 99 S. Ct. at 668. The absolute disparity was less than 10%. Thus, defendant was required to attribute the disparity to something other than coincidence. We note that the only support which defendant presented in favor of his argument was defense counsel's own representations concerning the percentage of African-Americans in Lake County and the percentage of African-Americans in the venire. Further, defendant has only provided information concerning one venire. That defendant asks us to throw out the entire jury-selection process in Lake County based on the makeup of one venire is unreasonable.

■ Defendant has also not met the third prong of the *Duren* test, which requires that defendant show that the underrepresentation is due to the systematic exclusion of the group in the jury-selection process. *Duren*, 439 U.S. at 364, 58 L. Ed. 2d at 587, 99 S. Ct. at 668. Defendant has provided no evidence in support of his argument that the alleged exclusion of African-Americans on the jury venire is inherent in the particular jury process utilized. See *Ashley*, 54 F.3d at 314.

Defendant's only argument in support of this third prong is based on his assumption that, because the jury venire is selected from a list of persons with drivers' licenses, poor people, including blacks, are excluded from the jury. Defendant argues that poor people cannot serve on juries because they cannot afford the insurance needed to drive. First, poor people are not a distinct group for purposes of the *Duren* test. We are concerned with the representation of African-Americans on the venire. Second, defendant has presented no statistical evidence that African-Americans do not obtain drivers' licenses because they cannot afford car insurance. Third, there is no legal requirement which precludes an individual without insurance from obtaining a driver's license. Moreover, we presume that many persons obtain drivers' licenses for identification purposes, and not just to drive automobiles.

Thus, defendant's argument that the jury-selection process in Lake County violated his sixth and fourteenth amendment rights to have a jury selected from a fair cross-section of the community is meritless.

■ Defendant also argues that the jury-selection process denied him equal protection of the laws. In order to show an equal protection violation in the context of jury selection, the defendant must show that (1) the group allegedly singled out is a distinct class; (2) the underrepresentation must be proven by examining the percentage of the group called and the percentage of the group in the community over a period of time; and (3) the selection process is susceptible to

abuse or is not racially neutral. *Castaneda v. Partida*, 430 U.S. 482, 494, 51 L. Ed. 2d 498, 510-11, 97 S. Ct. 1272, 1280 (1977).

■ Again, we acknowledge that African-Americans are a distinct group. However, defendant has wholly failed to meet the second and third prongs of the *Castaneda* test. As to the second prong, the only evidence which defendant has presented is the racial makeup of one venire. In examining all the cases which have discussed the racial makeup of juries, we have found no cases which have determined that a defendant's equal protection rights are violated based on the racial makeup of one venire. As to the third prong, defendant has presented no evidence to indicate that the jury-selection process was susceptible to abuse or was not racially neutral. Again, the only attempt at such an argument is the unsupported allegation that poor people cannot get drivers' licenses.

Thus, for the foregoing reasons, the verdict of the circuit court of Lake County which found defendant guilty of two counts of unlawful possession of a controlled substance is affirmed.

Affirmed.

GEIGER and DOYLE, JJ., concur.