THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARCUS BRADLEY, Defendant-Appellant.

Fifth District    No. 5—02—0097

Opinion filed April 16, 2004.—Motion to publish granted May 13, 2004.

Marcus Bradley, of Menard, appellant *pro se.*

Robert Haida, State's Attorney, of Belleville (Norbert J. Goetten, Stephen E. Norris, and Kevin D. Sweeney, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

Marcus Bradley took strong offense at the fact that Dewayne Wilson had beaten up Marcus's younger brother. Marcus was heard to say: "That nigger fuck my brother up. It's not going on like that." A few hours later, in the early morning of December 5, 1999, Marcus and his brother Antoine Bradley, accompanied by Diwone Walker, Alexander Matlock, David Taylor, and Terrance Luster, drove to Dewayne Wilson's house, intent on settling the score.

Marcus and Diwone, armed with shotguns, kicked down the front door and entered the Wilson home while Taylor and Luster stood watch with two-way radio sets. When Diwone saw Montez Wilson, Dewayne's brother, he shot him in the back. Montez died from the wound.

Marcus found Tina Jackson, Dewayne's girlfriend and mother to Dewayne's three young children. He jammed the barrel of the shotgun against Tina's head and demanded to know where he could find Dewayne. Apparently, Tina was not forthcoming enough to satisfy Marcus. With the shotgun barrel flush against Tina's head, he pulled the trigger. Marcus blew Tina's brains out. When he returned to his cohorts, waiting for him at the car, he explained why he had decided to kill a defenseless young woman: "I told the bitch to tell me where Wayne was at."

Marcus Bradley, the defendant, stood trial for two counts of first-degree murder. A St. Clair County jury found him guilty on both counts. The foreperson of that jury was a black woman. She was the only person of African-American descent among the 48 prospective jurors who composed the jury venire in this case.

The defendant discharged his appellate counsel, opting for the legal assistance of inmate law advocate Geoffrey W. Freeman. We are presented several questions to decide.

The defendant argues that defense counsel was incompetent. This is his argument:

> Only one African American was present in a venire of 48, where a random and racially neutral method of selecting the venire would have resulted in about 14 African-American venire members; consequently, defense counsel was ineffective where he failed to understand and meet his burden of presenting a *prima facie* case regarding the purposeful exclusion of African Americans from the venire from which the defendant's jury was selected.

The manner in which the issue is framed calls for a simple observation from the outset. We cannot imagine how a difference in the racial composition of this defendant's jury could possibly have resulted in an outcome other than the one that this jury reached. We do not think black jurors would have had any more doubt about the defendant's

guilt than jurors of a different race. Indeed, the foreperson's race would seem to bear out that conclusion. Had counsel failed to uncover a constitutionally flawed jury panel selection process entitling him to a different panel of jurors, that failure is not of a kind that would alter our confidence in the worth of this jury's verdict. We will nonetheless address the question of whether counsel's performance was substandard.

■ It is well-settled that the constitution promises that everyone's jury will be drawn from a fair cross-section of the community and that members of a distinctive group in the community will not be systematically excluded from jury service. *People v. Hobley*, 159 Ill. 2d 272, 304, 637 N.E.2d 992, 1006 (1994), relying on *Taylor v. Louisiana*, 419 U.S. 522, 527, 42 L. Ed. 2d 690, 696, 95 S. Ct. 692, 696 (1975). To establish a *prima facie* violation of the fair-cross-section requirement, the defendant is required to establish the following:

> "(1) the group alleged to be excluded is a 'distinctive' group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) the under[ ] representation is due to systematic exclusion of the group in the jury selection process." *Hobley*, 159 Ill. 2d at 304-05, 637 N.E.2d at 1006, citing *Duren v. Missouri*, 439 U.S. 357, 364, 58 L. Ed. 2d 579, 586-87, 99 S. Ct. 664, 668 (1979).

While the defendant establishes the first prong of the violation by reason of his race (*People v. Omar*, 281 Ill. App. 3d 407, 414, 666 N.E.2d 383, 388 (1996), citing *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149, 106 S. Ct. 1758, 1766 (1986)), we find that an underrepresentation of African-American people on one jury panel does not allow for the conclusion that evidence of systematic and purposeful exclusion must exist. There needs to be some showing of underrepresentation as a pattern, with a particular group underrepresented on jury panels over a significant period of time. As the Illinois Supreme Court succinctly stated in *People v. Hobley*: "The fair-cross-section requirement deals with the method of selecting jurors from all eligible citizens. Defendant has not shown that the low number of blacks on the venire from which his jury was chosen resulted from anything other than pure chance. This is insufficient to show a violation of the fair-cross-section requirement." *Hobley*, 159 Ill. 2d at 305, 637 N.E.2d at 1006.

Following the defendant's argument, we would necessarily have to assume, because of the statistical improbability of what occurred in this case, that counsel would have found a constitutionally flawed process had he tried to find it.

The question of trial counsel's competence has its genesis in what happened when the jury venire marched into the St. Clair County criminal courtroom and counsel saw only one black person in the entire venire. Unnerved by a notable absence of black people on the panel, trial counsel commented upon the oddity and asked the trial judge to discharge the panel because of the obvious underrepresentation of blacks. After defense counsel requested, in general terms, that the trial judge conduct a hearing to develop more evidence of how the underrepresentation had occurred, his request for the panel's discharge was denied, based upon the absence of any showing that the panel's composition was the result of a systematic exclusion of African Americans from St. Clair County jury service.

We are told that "counsel completely dropped the ball." It is argued that he should have shown the statistical improbability of having a venire with less than 3% African-American members drawn from a population composed of 28.8% African Americans. The argument is premised upon the assumption that a showing of statistical improbability would be sufficient to establish a *prima facie* case of a systematic and purposeful exclusion of black people from St. Clair County jury panels. This assumption rests upon the conclusion that the "presence of a single African[ ]American on the venire in this case suggests that it is a statistically significant aberration that would not occur by mere chance."

While we are willing to agree that underrepresentation on an isolated jury panel might suggest a flawed process, we are not willing to presume that underrepresentation is not something that can occur through random luck. Nor are we enamored with the conclusion implicit in the defendant's argument—that had counsel looked into the St. Clair County jury panel selection process, his examination would have necessarily uncovered evidence of a method that systematically excludes black people from jury service.

The record actually belies such a conclusion. It also provides an answer for counsel's inaction. Counsel was apparently at a loss to explain the aberrant racial composition on this particular jury because experience had taught him that racial balance was the norm. The request to discharge was clearly based upon the atypical racial composition of this one jury, not a belief that this jury represented a pattern that evinced a purposeful exclusion of blacks from jury service. Trial counsel commented, "I've never seen a panel like that in St. Clair County." He added, "[I]n 22 years of practicing law in these courts I've never seen a group, particularly African[ ]Americans, as under[ ]represented as in this case." Counsel obviously did not like the racial composition of the jury panel that he drew. But based upon

his experience, he had no basis to show that it was the result of a constitutionally flawed selection process.

We simply are not prepared to find trial counsel constitutionally incompetent for a potentially phantom failing. We cannot find that counsel's performance fell below the objectively reasonable performance that the constitution contemplates from trial counsel. Counsel's failure to present statistics did not alter the fact that he possessed nothing upon which to base a conclusion that the jury panel's composition was the result of a systematic method employed to exclude blacks from St. Clair County jury panels. Moreover, counsel's failure to conduct a further investigation into the jury panel selection process could very well have been no more than a failure to look for something that simply did not exist.

■ Next, the defendant argues that the State pursued him on an invalid indictment. The State properly frames the issue. We decide whether under Illinois law an indictment charging a crime in the language of the statute is sufficient to allow the People to proceed on a theory of accountability. The Illinois Supreme Court decided this question in 1969 when it noted:

> "There is no distinction under our statute between an act performed by the accused himself and the act of another for which he is legally accountable. [Citation.] An indictment need not so distinguish." *People v. Nicholls*, 42 Ill. 2d 91, 100, 245 N.E.2d 771, 777 (1969).

■ The next question for decision is whether defense counsel was ineffective in failing to object to evidence, argument, and instruction directed to a theory of guilt by accountability. There simply was no legal basis to object to evidence that the defendant was guilty of murder under a theory of accountability. *Ergo*, counsel could not be incompetent for not objecting to that evidence.

■ Next, the defendant argues that he was not proven guilty, beyond a reasonable doubt, of the two murder charges. While a number of the witnesses who testified against the defendant were unsavory accomplices, and all seven witnesses who implicated him in the shooting deaths were less than stellar individuals, the jury was entitled to believe their testimony. We cannot say that a rational juror could not find the defendant guilty on the evidence presented, particularly when that evidence is viewed, as it must be, in a light most favorable to the State (*People v. Tye*, 141 Ill. 2d 1, 13-14, 565 N.E.2d 931, 937 (1990)).

■ Next, the defendant maintains that he was deprived of his statutory right to a speedy trial. His argument is premised upon the belief that his appointed attorney, who later withdrew because of a

discovered conflict of interest, could not act on his behalf prior to that withdrawal. It follows that several continuances requested by that lawyer did not toll the running of the statutory time constraints.

The defendant was arrested on December 11, 1999. Apparently, sometime thereafter the defendant hired Marqua McCull-Billingsley as his defense counsel. Between January 21, 2000, and February 23, 2000, counsel failed to appear on three consecutive court dates and, ultimately, was found in contempt for her failings. She moved to withdraw from the case and was given leave to do so. It is well-settled that delays caused by a defense counsel's failure to appear at scheduled settings will not be attributed to the State for purposes of calculating the statutory speedy trial term. *People v. Scotti*, 131 Ill. App. 3d 571, 573, 475 N.E.2d 1097, 1099 (1985); *People v. Logan*, 117 Ill. App. 3d 753, 757, 453 N.E.2d 1317, 1319 (1983).

Private counsel's withdrawal from the case necessitated the appointment of the St. Clair County public defender. The appointment occurred on February 17, 2000. An assistant public defender named Karen Craig was assigned the defense. She either moved for or agreed to several continuances between February 23, 2000, and May 5, 2000. On May 5, 2000, Ms. Craig was permitted to withdraw by virtue of an apparent conflict of interest. Ms. Craig discovered that two of the prospective State witnesses against the defendant were former clients. She advised the judge that she might be inhibited in cross-examining those witnesses. Implicit in her request was the fact that her potential inhibition could prejudice the defense.

Another delay occurred between May 5, 2000, and May 12, 2000, when the defendant's newly assigned assistant public defender failed to appear. All the delay between February 23, 2000, and May 12, 2000, was attributable to the defense.

The case was continued at the defendant's request several more times between May 12, 2000, and the eventual September 24, 2000, trial date.

The key component of the defendant's position involves the time span from February 23, 2000, through May 5, 2000, the period of time that Karen Craig was counsel of record. The defendant maintains that because of her conflict, Ms. Craig was not really his attorney and that he cannot be held to the delays she asked for or the delays with which she agreed during her tenure as assigned counsel.

There is no authority to support this novel reading of the interrelationship of defense counsel's duty of undivided loyalty, representative legal actions on behalf of a client prior to the discovery of a potential conflict, and the effect of those actions upon the statutory right to a speedy trial. However, we have never treated, and will not

now begin to treat, the prior actions of an attorney as a nullity whenever a potential conflict of interest crops up. We doubt that we would accept the defendant's position even if the attorney labored under a *per se* conflict of interest. However, given the nature of Ms. Craig's potential conflict, her actions on behalf of the defendant prior to her withdrawal tolled speedy trial constraints, and the continuance delays are properly attributable to the defendant. Her requests for continuances and her agreement to them were attributable to the defendant, whether or not he personally agreed to them. *People v. Hall*, 194 Ill. 2d 305, 328, 743 N.E.2d 521, 535 (2000). Her requests and consents were not rendered null and void by the subsequent discovery of a potential conflict of interest.

■ Finally, the defendant's brief contains a sixth issue. He writes:

"Certainly a defendant that has been convicted based on the jury considering uncharged offenses is plain[ ]error. And for the State to actually ask that this Court affirm what was done in the trial court in this case is troubling to say the least. Such a position embraces the act of arguing before a jury and instructing a jury on uncharged offenses, and a defendant being convicted on those uncharged offenses. The fact that the State refuses to acknowledge this as error is more of an [*sic*] reason for this Court to enter an Order which educates the State and captures their attention to the severity of their acts."

We believe the defendant is saying that his argument over the charging instrument, and the absence of written notice of an accountability theory contained within that instrument, should be considered under the plain-error doctrine. Since the Illinois Supreme Court determined more than three decades ago that there is no error in how these crimes were charged, we have no need to apply a plain-error analysis. See *Nicholls*, 42 Ill. 2d at 100, 245 N.E.2d at 777.

For the reasons stated, we affirm.

Affirmed.

CHAPMAN, P.J., and WELCH, J., concur.